UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No: **07-80121-CR-MARRA/HOPKINS**

18 U.S.C. § 371
18 U.S.C. § 1341
18 U.S.C. § 1343
18 U.S.C. § 1346
18 U.S.C. § 981(a)(1)(C)
21 U.S.C. § 853
26 U.S.C. § 7206(1)
28 U.S.C. § 2461

UNITED STATES OF AMERICA,
            Plaintiff,

vs.

WARREN H. NEWELL,
            Defendant.

_____/

## INFORMATION

The United States Attorney charges that:

## GENERAL ALLEGATIONS

At all times relevant to this Information:

*The Public Entities.*

1.    The Palm Beach County Board of County Commissioners ("BCC") was the legislative and policy-setting body of County government in Palm Beach County, in the Southern District of Florida. Seven Commissioners were elected from single-member districts to staggered four-year terms to represent the entire County.

2.    Palm Beach County employed a county attorney, county administrator, and county auditor. They each, in turn, supervised numerous lower-level staff who were charged with the

**07-80121-CR-MARRA/HOPKINS**

responsibility of discharging their respective duties, mandates and missions.  The county attorney, county administrator, and county auditor individually and collectively served at the pleasure of the BCC.

3.      The county administrator supervised the Director of Facilities Management, which was responsible for the Director of Property and Real Estate Management ("PREM").  PREM was charged with the responsibility of negotiating and executing contracts for the purchase and sale of publicly owned interests in real estate.

4.      The BCC had available to it the Palm Beach County Code of Ethics passed in 1994, which Code of Ethics proscribed standards for the conduct of elected officials.

5.      The BCC had available to it a Form 8B "Memorandum of Voting Conflict for County, Municipal and Other Local Public Officers" for execution within a set period of time upon perception of a voting conflict of interest on a matter before the BCC.  Once completed and executed, Form 8B was attached to the minutes of the pertinent BCC meeting.

6.      As an elected public official, each BCC member executed under penalty of perjury State of Florida Form 6 "Full and Public Disclosure of Financial Interests," which Form 6 was filed annually before July by mail to the Commission on Ethics, State of Florida, in Tallahassee, Florida.

7.      The City of West Palm Beach ("West Palm Beach") was an incorporated City within Palm Beach County.  West Palm Beach had an elected Mayor and five elected city commissioners whose vote was required on all public expenditures of monies.  West Palm Beach provided a multitude of services to its citizens, including the maintenance, allocation, and distribution of its limited water resources.

07-80121-CR-MARRA/HOPKINS

8.      The South Florida Water Management District ("SFWMD"), was a 16-county regional agency of the State of Florida, charged with managing and protecting water resources of the region by balancing and improving water quality, flood control, natural systems and water supply. SFWMD's boundaries extended from central Florida to Monroe County, and from the Gulf Coast to the Atlantic Ocean, including Lake Okeechobee, the Everglades, the Florida Keys and Florida Bay.  As part of its mandate and mission, the SFWMD was responsible in part for the retention, storage, allocation, and distribution of the region's limited water resources.

9.      As a significant part of its overall environmental mission, the SFWMD was funded by the State of Florida and the United States which allowed the SFWMD to purchase land for the retention, storage, and distribution of water.  The SFWMD has created a land acquisition section staffed by attorneys and support personnel in furtherance of its land purchase mission.

10.     Indian Trail Improvement District ("Indian Trail") was a Special Taxing District created by the Florida Legislature whose mandate required Indian Trail to use those collected taxes to provide drainage, road grading, and infrastructure improvements within certain geographic areas in Palm Beach County.  Indian Trail served approximately 40,000 residents in Palm Beach County and had approximately 65 full-time employees.

11.     Indian Trail had an elected five member Governing Board whose vote was required on all public expenditures of monies, including the execution and letting of engineering contracts. Indian Trail employed SFRN, Inc. as its contracted engineer from in or around 1992 through in or around 2002.

3

*Land Use, Public Land Sales, Monetary Expenditures, and Bond Related Issues.*

12.     Land use, zoning and related issues all must be resolved before development of any parcel of real estate in Palm Beach County. Those issues were controlled by the particular municipalities in which the land was situated, or by the BCC if the land was situated in unincorporated Palm Beach County.

13.     The citizens of Palm Beach County owned interests in real property in Palm Beach County. Those property interests were acquired, sold and transferred through signed contracts negotiated and executed through PREM.

14.     Multiple independent appraisals were necessary and required prior to the execution of any contract which involved the acquisition, transfer, and sale of publicly held interests in real property. Those signed contracts, together with all backup paperwork pertaining to the transaction, including appraisals were submitted for final approval by the BCC.

15.     The BCC sat and voted upon expenditures of public funds for the betterment of its citizens, which expenditures included contracts for the allocation, retention and distribution of water resources, contracts for services, including research studies, and roadway expansion.

16.     Palm Beach County, through action of the BCC, proposed the issuance of bonds as a method of borrowing money to supply additional funding for worthwhile public purposes. After bonds were proposed through a BCC-approved resolution, they were placed on a public ballot for final voter approval.

17.     Once the bond issuance was publicly approved, BCC employed outside private law firms to handle the bond matters, including issuing legal opinions as to the validity of the bond, its

4

## 07-80121-CR-MARRA/HOPKINS

restrictions and covenants, and the appropriateness of the proposed BCC actions utilizing those bond funds.

*Relevant Private Businesses.*

18.     SFRN, Inc. ("SFRN") was a Florida corporation doing business as a Palm Beach County-based engineering firm first established in 1980 as Shalloway, Inc. Later, it changed its name to Shalloway, Foy, Rayman, & Newell, Inc. prior to eventually becoming SFRN. One of the shareholders and officers of SFRN was the defendant, WARREN H. NEWELL, who owned approximately 25% of the company.

19.     Palm Beach Aggregates ("Aggregates") was a land holding and mining company located in Palm Beach County. As part of its real estate holdings, it owned an approximate 1,250 acre tract of undeveloped real estate located in unincorporated Palm Beach County which had previously been mined for shell rock. Those mining operations left large holes in the ground, six of which ("the cells") were deemed suitable for future water storage.

20.     Rio Bravo, Inc., ("Rio Bravo") was a Florida corporation formed in or around May 1998 at the direction of K.D.S., a person known to the United States Attorney, and its officers and shareholders included, among others, the defendant, WARREN H. NEWELL. The defendant owned approximately 19% of Rio Bravo, which was created as a holding company to receive profits from an executed and secret success fee contract between the Aggregates and Rio Bravo for an anticipated contract between the SFWMD and Aggregates concerning regional water storage within the cells. This success fee contract provided for a 3% award to Rio Bravo of all monies collected by the Aggregates from the SFWMD for water storage within the cells. This success fee contract was not

disclosed to the SFWMD, the BCC, or the public. Rio Bravo was dissolved in or around January 2002.

21. Shalloway Engineers, Inc. ("SEI"), was a Florida corporation formed in or around June 2003 to further succeed Rio Bravo's corporate role as a holding company to receive profits from the secret success fee contract.

22. WMJB Marine, Inc.("WMJB"), was a Florida corporation which owned the Palm Beach Yacht Center ("PBYC"), located on 9 acres on South Federal Highway just south of Hypoluxo Road, Hypoluxo, in Palm Beach County. PBYC was an operating boat yard, dry storage facility, and full service marina with boat slips available for rental. PBYC was located in the BCC district of Mary McCarty, an elected BCC Commissioner. The majority owners of PBYC were L.B.B. and H.B., persons known to the United States Attorney, who owned PBYC since in or around 1984.

23. Southern Community Bank ("Southern") was a Palm Beach County-based financial institution which was formed in or around June 2002, in which L.B.B., and the defendant, WARREN H. NEWELL, among others, were directors and stockholders from in or around 2002 through in or around 2004. L.B.B. and others, including a registered lobbyist with business before the BCC, recruited defendant NEWELL to invest in Southern Community Bank.

24. Legacy Bank of Florida ("Legacy"), was a Palm Beach County-based financial institution initially contracted to be formed by L.B.B., defendant WARREN H. NEWELL, and others, in or around September 2005, and chartered for final approval as a financial institution in or around April 2006. Defendant NEWELL became a prospective investor in Legacy in or around September 2005, through a consortium of partners, including L.B.B., and others. Defendant

## 07-80121-CR-MARRA/HOPKINS

NEWELL became a stockholder and director in Legacy with L.B.B. and others in or around April 2006.

25.    J.P.J. Development and Design, Inc. ("JPJ."), was a Florida corporation formed in or around September 2004, to develop the Melaleuca property in Palm Beach County. Its officers and stockholders were D.K., R.T., persons known to the United States Attorney, and the defendant, WARREN H. NEWELL.

26.    Congress Medical Park I and Congress Medical Park II, were Florida corporations formed in or around September 2004 at the direction of R.T. and D.K., persons known to the United States Attorney, and the defendant WARREN H. NEWELL. These corporations were formed for the sole purpose of building and managing medical related office buildings which were to be built by JPJ on the Melaleuca property.

27.    Metro Acquisitions, LLC ("Metro") was a shell corporation for Lauth Property Group, LLC, a nationally known construction and development company headquartered in Indiana. In or around July 2005, Metro signed a contract with JPJ to assume development rights at the Melaleuca property which contract was assigned to Select Medical in or around October 2006.

28.    Select Medical Corporation ("Select Medical"), was a national company headquartered in Pennsylvania, dedicated to the placement, development, and management of acute long term care hospital facilities.

*Relevant Persons.*

29.    K.D.S. was the President and part owner of SFRN and President and sole owner of SEI.

07-80121-CR-MARRA/HOPKINS

30.    E.A.T., a person known to the United States Attorney, was the President and part owner of Aggregates.

31.    L.B.B. was a majority owner and operator of PBYC, and was a principal investor, director and stockholder in Southern and Legacy.

32.    H.B. was a majority owner of PBYC, and an investor in Southern and Legacy.

33.    R.T. was a medical professional, and principal officer and investor in JPJ.

34.    D.K. was a principal officer and investor in JPJ.

35.    G.G., a person known to the United States Attorney, was a legal professional and partner at a West Palm Beach-based law firm, and acted as closing agent on the real estate closing between JPJ and Select Medical.

36.    C.L.W., a person known to the United States Attorney, was a legal professional and G.G.'s partner, and represented defendant WARREN H. NEWELL in defendant NEWELL's divorce action with J.H., defendant NEWELL's ex-wife.

*The Business Ventures and Transactions.*

*A.    The $190,000,000 SFWMD Water Storage at the Cells*

37.    As early as in or around 1998, K.D.S. determined that the cells on the Aggregates property were suitable for water storage for runoff from Indian Trail.

38.    K.D.S. subsequently persuaded SFWMD that the cells could serve as long-term water retention, storage, and distribution for citizens of Palm Beach County, and West Palm Beach.

39.    The BCC funded studies, in conjunction with Indian Trail, the SFWMD, and West Palm Beach, to determine the viability of the water storage plan at the cells. Defendant WARREN H. NEWELL, voted on the allocation of these funds without disclosing his secret and hidden

financial stake in the SFWMD payments to the Aggregates.  Further, defendant NEWELL's subsequent disclosures regarding his financial interests with Indian Trail and the water storage studies were false and misleading.

40.     In or around February 2003, SFWMD agreed to pay Aggregates approximately $190,000,000 for water storage within the cells.

41.     Beginning in or around July 2003, the Aggregates began to pay SEI on the secret success fee contract with monies paid by the SFWMD to the Aggregates for the water storage within the cells.

42.     By July 2007, SEI was paid approximately $2,375,994 on the secret success fee contract, of which approximately $366,000 was distributed to defendant WARREN H. NEWELL.

B.     *The $50,000,000 Waterfront Bond*

43.     Beginning as early as in or around January 2002, defendant WARREN H. NEWELL, kept his personal motor vessel at PBYC at a 50% reduced dockage rate.

44.     From in or around January 2002 and continuing through in or around May 2006, defendant WARREN H. NEWELL paid only a very small portion of his expenses with PBYC, accumulating a debt of approximately $48,092.

45.     As early as in or around March 2004, defendant WARREN H. NEWELL publicly advocated for a bond resolution securing public funds to preserve waterfront access for the people of Palm Beach County.

46.     A resolution was adopted by the BCC in or around August 2004 to place the issuance of a $50,000,000 waterfront preservation bond on the November 2004 ballot for voter approval.

07-80121-CR-MARRA/HOPKINS

47.     In November 2004, the citizens voted for the issuance of the $50,000,000 bond to preserve their access to, and the preservation of, waterfront properties. The bond gave the discretion to the BCC to find suitable public and private investment on behalf of the citizens to achieve those goals. With regard to private investment, the bond required the passing of a real property interest to the public to make the bond award valid.

48.     Defendant WARREN H. NEWELL advocated on numerous occasions, both in public and to PREM, for the PBYC to receive a substantial portion of the waterfront bond money to purchase partial development rights for the citizens of Palm Beach County. The purchase of development rights is not a recognized interest in real property.

49.     While defendant WARREN H. NEWELL was a person doing business with PBYC, that fact remained a secret and was not disclosed, and the citizens not conducting business with PBYC did not receive an easement to PBYC.

50.     After the PBYC received $14,000,000 in waterfront bond monies in or around March 2006, defendant WARREN H. NEWELL agreed with L.B.B. and K.D.S. to create a false and fraudulent SFRN invoice to PBYC which was designed and intended to create an appearance that defendant NEWELL paid his outstanding PBYC bill, however, in actuality he paid PBYC with monies generated from the fraudulent invoice and paid PBYC with PBYC's monies.

C.     *The $4,400,000 Melaleuca Property Development*

51.     Two vacant adjacent parcels of real estate situated in the Lake Worth area of Palm Beach were available for sale in or around April 2004. The property, located in defendant WARREN H. NEWELL's commission district, was located west of Congress Avenue on the south side of Melaleuca Lane, and originally consisted of 6.75 acres, split by a vacant 30-foot-wide right

of way owned by Palm Beach County. The properties were originally zoned for medical office space.

52.    In or around September 2004, three separate limited liability companies were formed connected to the development of the Melaleuca properties: JPJ, Congress Medical Park I, LLC, and Congress Medical Park II, LLC. All three of the corporations listed their initial members as defendant WARREN H. NEWELL, D.K., and R.T. The members of JPJ intended to build medical office buildings on the property. Those corporations assumed the earlier, July 2004 executed option contracts for the purchase of the property.

53.    By December 2004, JPJ contracted with SFRN to do engineering work on the Melaleuca property.

54.    By January 2005, defendant WARREN H. NEWELL invested $30,443 into the Melaleuca development project.

55.    On two separate occasions, beginning on or about February 15, 2005, defendant WARREN H. NEWELL voted in the BCC for the relinquishment of the county right-of-way on the Melaleuca properties and the extension of the time period within which the Melaleuca property could be developed and failed to disclose his financial relationship with JPJ, the Melaleuca property projects, and his anticipated future payment from JPJ.

56.    Despite his resignation from JPJ on or about February 14, 2004, defendant WARREN H. NEWELL continued to advise JPJ regarding its contract "flip" to Metro and Select Medical. Subsequently, defendant NEWELL insisted that he share in the profits of the sale of the property and requested a payment in excess of $150,000.

07-80121-CR-MARRA/HOPKINS

57.    Prior to October 2006, defendant WARREN H. NEWELL agreed with K.D.S. to create a false and fraudulent SFRN invoice to JPJ for "additional engineering services" for $100,000, which money defendant NEWELL and K.D.S. knew was for defendant NEWELL's sole and exclusive use and benefit.

58.    Select Medical closed on the contract with JPJ for the development of the Melaleuca property in or around October 2006 for $4,400,000.

*The Defendant.*

59.    In or around November 1992, November 1996, November 2000, and finally, November 2004, defendant WARREN H. NEWELL was elected to separate four-year terms as a Palm Beach County Commissioner for District 3, which District covered the east-central portions of Palm Beach County.

60.    On or about November 20, 1996, November 21, 2000, and again November 17, 2004, defendant WARREN H. NEWELL took and executed an oath of office swearing to uphold the Constitutions and Governments of the United States of America and State of Florida.

61.    As a sworn public official, defendant WARREN H. NEWELL had a legal and ethical responsibility to perform his duties free from fraud, self-enrichment and self-dealing.

## COUNT 1
### (Conspiracy, (18 U.S.C. §§ 371, 1341, 1343, 1346, and 26 U.S.C. §7206(1))

62.    The United States Attorney re-alleges and incorporates herein by reference the General Allegations Section of this Information.

### 07-80121-CR-MARRA/HOPKINS

63.     Beginning in or around June 1999, and continuing through on or around July 2, 2007, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant,

### WARREN H. NEWELL,

did knowingly and willfully combine, conspire, confederate, agree and reach a tacit understanding with at least one other person, known and unknown to the United States Attorney, to commit offenses against the United States, that is,

(a)     to knowingly and willfully devise a scheme and artifice to defraud and deprive another of the intangible right of defendant WARREN H. NEWELL's honest services, and, for the purpose of executing this scheme and artifice, to knowingly use and cause to be used the United States mails or private or commercial interstate carriers, and did knowingly cause to be transmitted in interstate and foreign commerce by means of wire communications certain signals and sounds, in violation of Title 18, United States Code, Sections 1341, 1343 and 1346; and

(b)     to willfully make, subscribe, and file a false federal personal income tax return for defendant WARREN H. NEWELL on Form 1040 for calendar year 2003, under penalty of perjury, well knowing that said 1040 was not true and complete as to every material matter reported therein, in violation of Title 26, United States Code, Section 7206(1).

### <u>OBJECT OF THE CONSPIRACY</u>

64.     It was the object of the scheme to defraud to unjustly enrich defendant WARREN H. NEWELL and others by having defendant NEWELL use his public position to advance ventures and relationships in which he had a concealed financial interest and to continue to conceal those financial interests and relationships.

13

07-80121-CR-MARRA/HOPKINS

65.   It was a further object of the conspiracy for defendant WARREN H. NEWELL to declare less income and pay less Federal Income Tax than he owed for calendar year 2003.

## MANNER AND MEANS OF THE CONSPIRACY

66.   Defendant, WARREN H. NEWELL used his public position to vote for the funding of the SFWMD water storage project at the cells on the Aggregates land, while he concealed his true financial interest in the secret success fee contract between Rio Bravo and the Aggregates.

67.   To misdirect the public as to defendant WARREN H. NEWELL's true financial relationship with Aggregates and the SFWMD contract with Aggregates, defendant NEWELL filed false and misleading Form 8B disclosures with the BCC.

68.   To further conceal defendant WARREN H. NEWELL's hidden financial interest in the success fee contract, defendant NEWELL agreed with K.D.S. to funnel defendant NEWELL's share of the success fee payments from SEI to SFRN and then disguise the payments from SFRN to defendant NEWELL as "bonus payments" unrelated to any specific SFRN business transaction.

69.   As a further concealment of defendant WARREN H. NEWELL's secret financial interest in the success fee contract, defendant NEWELL agreed with K.D.S. to disguise his 2005 share of the success fee payments as "a personal loan" from K.D.S. to defendant NEWELL.

70.   Defendant WARREN H. NEWELL continued his public deception regarding defendant NEWELL's receipt of the water storage monies by filing false and misleading Form 6 disclosures with the State of Florida and by making material misrepresentations to Federal law enforcement investigators.

## 07-80121-CR-MARRA/HOPKINS

71. Defendant WARREN H. NEWELL used his elected position to advocate the payment of $14 million of taxpayer monies to his business partner and benefactor, L.B.B. without disclosing his true financial relationship with L.B.B., and his significant financial debt to L.B.B. and the PBYC.

72. After the PBYC and L.B.B. received $14 million from the BCC, in order to avoid the true appearance of a $40,000 kickback debt forgiveness for his motor vessel from the PBYC, defendant WARREN H. NEWELL used his financial relationship with K.D.S. and L.B.B. to cause the issuance of a bogus invoice to PBYC from SFRN. PBYC's payment to SFRN on that fraudulent invoice was immediately disbursed by K.D.S. to defendant NEWELL as a "bonus," and defendant NEWELL subsequently used most of that "bonus" to make a substantial payment on his PBYC debt.

73. To further conceal the fact that the debt on the dockage at PBYC was forgiven, defendant WARREN H. NEWELL made material misrepresentations to Federal law enforcement investigators regarding the source of the monies for the payment of the PBYC debt.

74. Defendant WARREN H. NEWELL used his public position to vote for the abandonment of the right-of-way and extension of development rights necessary for the success of the JPJ project on the Melaleuca property without disclosing his financial relationship with JPJ.

75. Defendant WARREN H. NEWELL used his resignation from JPJ as a subterfuge to justify his public action with respect to JPJ and the Melaleuca project, fully expecting to be compensated at the time of the success of the Melaleuca project.

76. To conceal his true financial relationship with the Melaleuca project, defendant WARREN H. NEWELL filed false and misleading Form 8B disclosures regarding SFRN's financial relationship with the project.

**07-80121-CR-MARRA/HOPKINS**

77.    To further conceal defendant WARREN H. NEWELL's hidden financial agreement with the successful Melaleuca project, defendant NEWELL agreed with K.D.S. to submit a false and fraudulent SFRN invoice regarding non-existent work to be submitted at closing, fully expecting the monies paid on that invoice to be used for the sole and exclusive enjoyment of defendant NEWELL.

78.    To further conceal defendant WARREN H. NEWELL's hidden financial interest with the JPJ project at the Melaleuca properties, defendant NEWELL made materially false misrepresentations concerning his relationship with JPJ to Federal law enforcement investigators.

## OVERT ACTS

In furtherance of the above-described conspiracy and to advance the objects thereof, the defendant and other co-conspirators committed one or more of the following overt acts, among others:

### The $190,000,000 SFWMD Water Storage within the Aggregate Cells

79.    On or about June 8, 1999, defendant WARREN H. NEWELL voted to allocate public funds in the amount of $50,000 to fund a study to determine the viability of water storage by the SFWMD at the Aggregate cells without disclosing his financial interest in the project.

80.    On or about September 11, 2001, defendant WARREN H. NEWELL, in a false and misleading fashion, executed a Form 8B disclosing his financial interest with Indian Trail but failing to disclose his financial interest in the secret success fee contract between Rio Bravo and the Aggregates regarding water storage within the Aggregate cells.

81.    On or about January 3, 2002, defendant WARREN H. NEWELL, in a false and misleading fashion, executed a Form 8B disclosing his financial interest with Indian Trail but failing

07-80121-CR-MARRA/HOPKINS

to disclose his financial interest in the secret success fee contract between Rio Bravo and the Aggregates regarding water storage within the Aggregate cells.

82. On or about August 13, 2003, defendant WARREN H. NEWELL deposited $32,000 into his Grand Bank and Trust account, which money represented profits from the secret success fee contract concerning water storage within the Aggregate cells.

83. On or about September 15, 2003, defendant WARREN H. NEWELL deposited approximately $24,246 into his Grand Bank and Trust account, which money represented profits from the secret success fee contract concerning water storage within the Aggregate cells.

84. On or about December 5, 2003, defendant WARREN H. NEWELL deposited $57,887 into his Grand Bank and Trust account, which money represented profits from the secret success fee contract concerning water storage within the Aggregate cells.

85. On or about January 5, 2006, defendant WARREN H. NEWELL voted to modify conditions of excavation approval for the Aggregate cells without disclosing his financial interest in the project.

86. On or about March 10, 2006, defendant WARREN H. NEWELL and K.D.S. created and executed a fraudulent promissory note for $200,000.

87. On or about March 15, 2006, defendant WARREN H. NEWELL deposited $200,000 into his Grand Bank and Trust account, which money represented profits from the secret success fee contract concerning water storage within the Aggregate cells and was falsely concealed as a loan from K.D.S.

**07-80121-CR-MARRA/HOPKINS**

88. On or about June 29, 2006, defendant WARREN H. NEWELL filed a false and fraudulent 2005 Form 6 with the State of Florida indicating that his $200,000 income from the secret success fee contract from the water storage at the Aggregates was a loan from SFRN.

89. On or about January 16, 2007, defendant WARREN H. NEWELL falsely told Federal law enforcement investigators that the $200,000 he received from K.D.S. in March 2006 was a personal loan.

90. On or about July 2, 2007, defendant WARREN H. NEWELL filed a false and fraudulent 2006 Form 6 with the State of Florida indicating that his $200,000 income from the secret success fee contract from the water storage at the Aggregates was a personal loan from K.D.S.

### The $50,000,000 Waterfront Bond

91. On or about April 22, 2004, during a BCC meeting on zoning matters, defendant WARREN H. NEWELL announced his concern that the county was losing its valuable waterfront access, and he asked the board to direct staff to look at some mechanisms as to how the county could intervene in the sale of those properties and protect such properties in the future.

92. On or about May 25, 2004, defendant WARREN H. NEWELL voted in favor of directing BCC staff to prepare a resolution for a referendum on the November ballot to raise funds to preserve public access to waterways through general obligation bonds.

93. On or about June 22, 2004, defendant WARREN H. NEWELL caused L.B.B. and H.B. to submit a letter to him as County Commissioner proposing a trade of County land in exchange for PBYC's development rights.

94. On or about June 29, 2004, defendant WARREN H. NEWELL attached the letter from H.B. to an internal memorandum prepared by defendant NEWELL directed to PREM and

advocated for the purchase of PBYC development rights without disclosing defendant NEWELL's financial partnership with L.B.B. in Southern, and material financial debt to L.B.B., H.B., and PBYC.

    **95.**    On or about August 17, 2004, defendant WARREN H. NEWELL voted in favor of a resolution providing for a bond referendum on November 2, 2004, as to whether general obligation bonds not to exceed $50 million should be issued for the purpose of providing funds to preserve public access to waterfronts and to preserve working waterfronts in Palm Beach County. During this meeting, defendant NEWELL failed to disclose that he docked his boat at PBYC, that he owed PBYC boat dockage fees, or that he was a partner with L.B.B. at Southern.

    **96.**    On or about February 28, 2006, defendant WARREN H. NEWELL voted in favor of a resolution and agreement for the purchase and sale of the working waterfront preservation easement and declaration of restrictive covenants for PBYC for $14 million, despite the value of the development rights being purchased by the county was appraised at only $9.3 million. At this BCC meeting, defendant NEWELL failed to disclose that he docked his boat at PBYC, that he owed PBYC significant boat dockage fees, or that he formed a partnership with L.B.B., and others, to form Legacy.

    **97.**    On or about June 1, 2006, defendant WARREN H. NEWELL caused K.D.S. to issue a bogus invoice for engineering services to PBYC which L.B.B. agreed to pay knowing that the money would be returned to L.B.B. and the PBYC by defendant NEWELL after receipt by SFRN.

    **98.**    On or about June 2, 2006, WMJB issued check #27004 in the amount of $50,057.15 to pay the fraudulent SFRN summary bill.

99.     On or about June 16, 2006, SFRN direct deposited $46,175 of the WMJB funds, less taxes, into defendant WARREN H. NEWELL's Grand Bank and Trust account and defendant NEWELL and K.D.S. agreed to disguise the payment as "a bonus."

100.    On or about June 21, 2006, WMJB deposited defendant WARREN H. NEWELL's Grand Bank and Trust check #1531 in the amount of $37,500, which check was written on or about June 21, 2006 but backdated by defendant NEWELL to May 30, 2006. This payment purportedly represented defendant NEWELL's substantial payment of his four-year running debt at PBYC.

101.    On or about January 26, 2007, defendant WARREN H. NEWELL falsely told Federal law enforcement investigators that he paid PBYC on his long-standing debt with his own funds which were only made available after he settled his dissolution of marriage litigation.

### The $4,400,000 Melaleuca Property Development

102.    In or about April, 2004, defendant WARREN H. NEWELL contacted an individual controlling one of the trusts holding the Melaleuca properties about selling the property.

103.    On or about July 21, 2004, two contracts were signed between defendant WARREN H. NEWELL, D.K. and R.T. and the trusts to acquire options to purchase the two Melaleuca parcels for $1.9 million. Contingencies in the contract required the abandonment of the right-of-way owned by Palm Beach County and the extension of the time period within which any development could occur.

104.    On or about August 12, 2004, defendant WARREN H. NEWELL wrote a $5,000 check as his portion of the deposit for the land purchase.

### 07-80121-CR-MARRA/HOPKINS

105.   On or about September 28, 2004, defendant WARREN H. NEWELL opened a bank account on behalf of JPJ using a check drawn on defendant NEWELL's Grand Bank and Trust account in the amount of $10,000.

106.   On or about December 22, 2004, at defendant WARREN H. NEWELL's prompting, JPJ retained SFRN to provide engineering services for the Melaleuca development project.

107.   On or about January 7, 2005, defendant WARREN H. NEWELL invested an additional $15,000 in JPJ.

108.   In or about early February, 2005, defendant WARREN H. NEWELL advised his JPJ partners that he wanted to withdraw from the Melaleuca land deal, and requested reimbursement of his investment monies.

109.   On or about February 11, 2005, defendant WARREN H. NEWELL executed an "Assignment of Contract Interests" in favor of R.T. and D.K., backdated by G.G. to February 1, 2005, and subsequently resigned from JPJ on or about February 14, 2005, for undisclosed reasons. The capital investment buyout check to defendant NEWELL was backdated to February 1, 2005 and cashed by defendant NEWELL in or around April 2005.

110.   On or about February 14, 2005, defendant WARREN H. NEWELL signed a letter of resignation from JPJ.

111.   On or about February 15, 2005, defendant WARREN H. NEWELL voted in the BCC in favor of Palm Beach County abandoning a right of way which separated the two parcels comprising the Melaleuca properties without disclosing that only the day before he had resigned from JPJ, and that SFRN was retained by JPJ to provide services in connection with the development of that property.

## 07-80121-CR-MARRA/HOPKINS

112. On or about February 24, 2005, defendant WARREN H. NEWELL voted in the BCC to extend the deadline for development of the Melaleuca properties until December, 2005 without disclosing his financial relationship with JPJ.

113. On or about February 16, 2006, defendant WARREN H. NEWELL received a cash payment of $8,000 from R.T.

114. On or about February 23, 2006, defendant WARREN H. NEWELL announced during a BCC zoning board meeting that he was abstaining from voting on a JPJ request to change the Melaleuca zoning to allow the building of a hospital by stating that SFRN anticipated doing future engineering work with Select Medical without disclosing SFRN's current contract with JPJ and defendant NEWELL's financial relationship with JPJ.

115. On or about March 7, 2006, defendant WARREN H. NEWELL received another cash payment of $8,000 from D.K.

116. On or about April 26, 2006, defendant WARREN H. NEWELL caused SFRN to create a letter directed to JPJ stating that SFRN's engineering bills were paid in full.

117. On or about June 22, 2006, defendant WARREN H. NEWELL received a cash payment of $5216.50 from D.K.

118. On or about July 20, 2006, defendant WARREN H. NEWELL received a cash payment of $5216.50 from R.T.

119. On or about October 16, 2006, defendant WARREN H. NEWELL caused SFRN to submit a fraudulent invoice for $100,000 to be paid by JPJ at the closing on the sale of the Melaleuca properties from JPJ to Select Medical.

120.    On or about October 18, 2006, defendant WARREN H. NEWELL caused G.G. to disburse approximately $29,000 of the $100,000 credited at closing to Shalloway Engineering to C.L.W., as partial payment for defendant NEWELL's divorce representation.

121.    On or about January 16, 2007, at defendant WARREN H. NEWELL's direction, an additional $9,000 of the $100,000 Shalloway Engineering-earmarked funds were disbursed by G.G. to pay an accountant, a person known to the United States Attorney, for fees owed by defendant NEWELL incurred during his divorce litigation.

### The False Federal Income Tax Return

122.    On or about July 23, 2003, Aggregates transferred $180,000 to SEI representing a portion of its required payment under the secret success fee contract.

123.    On or about July 28, 2003, K.D.S. caused the transfer of $48,000 of SEI funds from the secret success fee contract with Aggregates from SunTrust Bank to SFRN's account at Fidelity Federal Bank, from which K.D.S. intended to pay defendant WARREN H. NEWELL his share of the success fee contract.

124.    On or about August 12, 2003, K.D.S. issued a check to defendant WARREN H. NEWELL in the amount of $32,000 from SFRN's Fidelity Federal Bank account, which monies represented defendant NEWELL's portion of the success fee contract initial payment, but was disguised by K.D.S. and defendant NEWELL as a "bonus payment."

125.    On or about August 13, 2003, defendant WARREN H. NEWELL deposited $32,000 into his Grand Bank and Trust account, which money represented profits from the secret success fee contract concerning water storage within the Aggregate cells.

**07-80121-CR-MARRA/HOPKINS**

126.   On or about January 3, 2005; defendant WARREN H. NEWELL failed to declare the $32,000 success fee income on his 2003 1040 Federal Income Tax Return.

All in violation of Title 18, United States Code, Section 371.

<u>**CRIMINAL FORFEITURE**</u>

Upon conviction of the violation alleged in Count 1 of this Information, the defendant,

**WARREN H. NEWELL,**

shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to the violations including, but not limited to, the following:

a.   The sum of $150,000 in United States currency;

b.   The monies held for SFRN, Inc., Shalloway Engineers, or defendant WARREN H. NEWELL, as proceeds from the real estate closing between Select Medical Corporation and J.P.J. Development and Design, Inc., located at the IOTA account of Glickman, Witters & Marell, PA at Colonial Bank, account #8025604656; and

c.   All interest in CitiGroup Global Markets, Inc., account #74D-00432-19-480 held in the name of defendant WARREN H. NEWELL.

Pursuant to Title 28, United States Code, Section 2461, Title 18, United States Code, Section 981(a)(1)(C), and Title 21, United States Code, Section 853.

If the property described above as being subject to forfeiture, as a result of any act or omission of the defendant,

**WARREN H. NEWELL,**

(1)   cannot be located upon the exercise of due diligence;

(2)   has been transferred or sold to, or deposited with a third person;

(3)     has been placed beyond the jurisdiction of the Court;

(4)     has been substantially diminished in value; or

(5)     has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property and, in addition, to require said defendant to return any such property to the jurisdiction of the Court for seizure and forfeiture.

All pursuant to Title 18 United States Code, Section 982 and Title 21, United States Code, Section 853.

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY

JOHN S. KASTRENAKES
ASSISTANT UNITED STATES ATTORNEY

JULIA A. PAYLOR
ASSISTANT UNITED STATES ATTORNEY

STEPHEN CARLTON
ASSISTANT UNITED STATES ATTORNEY

25

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

vs.

WARREN H. NEWELL,

_____ /

**CASE NO.**

**07-80121-CR-MARRA/HOPKINS**

**CERTIFICATE OF TRIAL ATTORNEY***

**Superseding Case Information:**

New Defendant(s)　　　　Yes _____　No _____
Number of New Defendants
Total number of counts

**Court Division:** (Select One)

_____ Miami　　_____ Key West
_____ FTL　_X_ WPB _____ FTP

I do hereby certify that:

1.　I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2.　I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3.　Interpreter:　(Yes or No)　　　No

　　List language and/or dialect

4.　This case will take　_20_　days for the parties to try.

5.　Please check appropriate category and type of offense listed below:
　　(Check only one)　　　　　　　　　　　　　　　　(Check only one)

| I | 0 to 5 days | _____ | Petty | _____ |
|---|---|---|---|---|
| II | 6 to 10 days | _____ | Minor | _____ |
| III | 11 to 20 days | _X_ | Misdem. | _____ |
| IV | 21 to 60 days | _____ | Felony | _X_ |
| V | 61 days and over | | | |

6.　Has this case been previously filed in this District Court? (Yes or No)　No
If yes:
Judge: _____　Case No. _____
(Attach copy of dispositive order)
Has a complaint been filed in this matter?　(Yes or No) _____ No
If yes:
Magistrate Case No. _____　N/A
Related Miscellaneous numbers: _____
Defendant(s) in federal custody as of _____ N/A
Defendant(s) in state custody as of _____ N/A
Rule 20 from the _____ District of _____

Is this a potential death penalty case? (Yes or No) _____ No

7.　Does this case originate from a matter pending in the U.S. Attorney's Office prior to April 1, 2003? ___ Yes _X_ No

8.　Does this case originate from a matter pending in the U. S. Attorney's Office prior to April 1, 1999? ___ Yes _X_ No
If yes, was it pending in the Central Region? ___ Yes ___ No

9.　Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003? _____ Yes _X_ No

10.　Does this case originate from a matter pending in the Narcotics Section (Miami) prior to May 18, 2003 ? _____ Yes _X_ No

_____
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No. 312827

26
Penalty Sheet(s) attached

REV.1/14/04

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:** WARREN H. NEWELL

**Case No:** 07-80121-CR-MARRA/HOPKINS

Count #: 1

Conspiracy

18 U.S.C. §§ 371, 1341, 1343, and 1346

**\* Max. Penalty:** 0 - 5 Years' Imprisonment, $250,000 Fine

Count #:

**\*Max. Penalty:**

Count #:

**\*Max. Penalty:**

Count #:

**\*Max. Penalty:**

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

07-80121-CR-MARRA/HOPKINS

## BOND RECOMMENDATION

**WARREN H. NEWELL**
Defendant.

Personal Surety Bond of $250,000 is recommended as to defendant.

JOHN S. KASTRENAKES
ASSISTANT UNITED STATES ATTORNEY